**In re EPIC ASSOCIATES V, et al., Debtors.**

**Bankruptcy Nos. 85–01306–A to 85–01646–A and 85–01724–A to 85–01739–A.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

July 11, 1986.

Roger M. Whelan, Richard J. Morvillo, Verner, Liipfert, Bernhard, McPherson & Hand, Chtd., Washington, D.C., for debtors-in-possession.

Barry J. Dichter, Mark C. Ellenberg, Cadwalader, Wickersham & Taft, Washington, D.C., for Committee of Equity Sec. Holders.

William J. Perlstein, Bruce Coolidge, Wilmer, Cutler & Pickering, William Daniel Sullivan, Melrod, Redman & Gartlan, Washington, D.C., for Ad Hoc Committee of Investors in EPIC Mortgages.

Daniel M. Lewis, Richard Schifter, Arnold & Porter, Washington, D.C., for Maryland Deposit Ins. Fund.

Warren L. Dennis, Ballard, Spahr, Andrews & Ingersoll, Washington, D.C., for First Nat. Bank of Maryland.

Craig H. Ulman, Hogan & Hartson, Washington, D.C., for South Boston Sav. Bank.

Howard L. Sedran, Levin & Fishbein, Philadelphia, Pa., Joseph S.U. Bodoff, Pincus, Verlin, Hahn & Reich, P.C., Philadelphia, Pa., for Limited Partners Murray, Heisey, Brickley & Gaffney.

Stephen E. Leach, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., for American Sav. & Loan Assn. of Irvine, California.

Norman E. Oliver, Alexandria, Va., Asst. U.S. Trustee.

## MEMORANDUM OPINION

MARVIN V.B. BOSTETTER, Jr., Chief Judge.

The following will supplement the findings and conclusions set forth in the record of the hearings held on March 11, 1986 and March 17, 1986 at the conclusion of which this Court approved the Disclosure Statement for the Debtors' Second Amended Joint Plan of Reorganization ("Disclosure Statement"), and as further set forth in the record of the hearings held on April 16, 1986, April 17, 1986, and April 25, 1986 wherein this Court confirmed the Debtors' Second Amended Joint Plan of Reorganization ("Joint Plan").

The debtors before this Court are three hundred and fifty-two real estate limited partnerships of which Equity Programs Investment Corporation ("EPIC") is the sole general partner. The business of each partnership consisted of purchasing residential properties and leasing them, either to real estate developers for use as model homes or to the public.

EPIC financed property acquisitions through a network of financial transactions, including the sale on the secondary market of first mortgage notes executed by the partnerships in favor of EPIC or an affiliate and the issuance of certificates of undivided beneficial interest in pools of these first mortgage notes. The primary purchasers of first mortgage loans and mortgage-backed securities were savings and loan institutions. The aggregate indebtedness of these partnerships on first mortgage notes exceeded one billion dollars. In addition, the operation of the partnerships was funded by limited partners' capital contributions (consisting of payments on subscription notes), by the issuance of second mortgage notes on the properties, by rental income, and by unsecured advances of funds from EPIC.

Several factors made the unsecured advances of funds, which were obtained by EPIC from Community Savings and Loan, Inc., necessary; weak rental housing markets, inadequate appreciation of partnership properties and slow sales of new limited partnership interests rendered the partnerships exceedingly short of operating capital. When, as a result of a crisis in the Maryland savings and loan industry, Community Savings and Loan, Inc. refused to extend further credit to the EPIC entities, the partnerships quickly defaulted on their debts. Obligations on all first mortgage loans fell into default in August of 1985, and the debtors filed their petitions for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978 on September 5 and September 19, 1985.

## TARDY AND CHANGED VOTES ON THE JOINT PLAN

At the commencement of the March 11, 1986 hearing on approval of the Disclosure Statement, the Court heard oral motions to adjourn and reschedule the proceeding in

view of the voluminous amendments to the Amended Joint Plan of Reorganization and accompanying Disclosure Statement contained in the Second Amended Joint Plan and its accompanying Disclosure Statement, which had been served the previous evening. The Committee of Equity Security Holders urged that to proceed with the hearing would offend the Due Process Clause of the Fifth Amendment to the Constitution because the limited partners and others thereby would be deprived of a meaningful opportunity to examine and respond to the Debtors' Second Amended Joint Plan of Reorganization and accompanying Disclosure Statement. Several other parties joined in the motion for a continuance, among them the United States Trustee, limited partners George E.P. Murray, Henry Heisey, Roger Brickley, and Dr.

Francis A. Gaffney (collectively the "Class Action Plaintiffs"),[1] the two banks acting as trustees for institutions holding EPIC Mortgage Pass-Through Certificates, and at least one lending institution.

Facing the Court was the consideration of the intricacy of the initial Plan and Disclosure Statement and the copious modifications, which made telling substantive changes in the treatment of creditors under the Plan as well as expanded the information contained in the Disclosure Statement. Also to be considered, however, was the April 30, 1986 deadline imposed by the regulatory position of the Federal Home Loan Bank Board ("FHLBB") regarding financial institutions holding mortgage loans upon which EPIC partnerships were in default [2]. Accordingly, the Court did not ad-

---

1. Messrs. Murray, Heisey, Brickley and Dr. Gaffney have filed class action suits against twenty-five named defendants, including Equity Programs Investment Corporation ("EPIC"), EPIC Holdings, Ltd., Community Savings and Loan, Inc., Maryland Deposit Insurance Fund ("MDIF"), EPIC Mortgage, Inc. ("EMI"), Tom J. Billman and Clayton C. McCuiston. The suits, filed in the United States District Court for the District of Maryland, allege common law fraud, securities fraud, breach of fiduciary duties, and violations of the Racketeer Influenced and Corrupt Organizations statute. The four plaintiffs purport to represent all persons who purchased partnership interests in the EPIC real estate limited partnerships from 1978 to 1985.

2. The interplay of several FHLBB regulations, which govern the conduct of thrift institutions insured by the Federal Savings & Loan Insurance Corporation, limited many creditors' willing participation in the Plan to the period ending April 30. After April 30, the regulatory scheme would force institutions holding EPIC loans in default to "schedule" the loans and set aside a reserve fund in the amount by which the loan balance exceeded the appraised value of the collateral real estate. *See* 12 C.F.R. § 561.16 (1985) (defining "slow loan"); 12 C.F.R. § 561.-15 (1985) (including slow loans in the definition of "scheduled items"); 12 C.F.R. § 563.17–2 (1985) (after appraisal of overvalued scheduled items, institution must maintain a specific reserve "in an amount equal to the overvaluation"). Once scheduling became mandatory, regulated institutions' support for reorganization rather than an expedited liquidation would assuredly evaporate.

Many of the EPIC loans would have qualified as scheduled items long before April 30 had the

FHLBB's Office of Examinations and Supervision not made a special ruling concerning treatment of some EPIC defaults. *See Alert Bulletin 64*, Federal Home Loan Bank Board Office of Examinations and Supervision, December 20, 1985 (distributed over the signature of Francis M. Passarelli, Acting Director). The Office accepted an escrow fund, created by three mortgage insurers who were participants in the reorganization negotiations, as sufficient to cure through October 30 the EPIC partnerships' defaults on insured mortgage loans. In the Office's estimation, several facets of the prospective plan permitted institutions to delay scheduling of overdue EPIC loans which were insured by these three mortgage insurers: modification of the terms of the loans retroactive to October 30; a uniform, reduced accrual rate of interest and a further-reduced uniform carry rate, payment of each to be guaranteed by the three mortgage insurers contributing to the escrow fund; deferral of interest until the date of confirmation. *See generally* Debtor's Second Amended Joint Plan of Reorganization, Article XIII: Modification of Covered Mortgage Notes, at 34. The EPIC loans, as restructured, were not "slow" and therefore not "scheduled items" because the escrow fund brought the loans current to the effective date of the modifications, and because no interest was due until confirmation of a plan. *See* 12 C.F.R. §§ 561.15–561.16 (1985). However, because under section 545–33(a) interest on a home loan must be payable no less often than semi-annually, the thrift institutions received only a six-month respite from scheduling their EPIC mortgage portfolios. The six-month grace period expired April 30, 1986. In addition, the three mortgage insurers' agreement to maintain the escrow fund was contingent upon confirmation of a plan on or before

journ the hearing. Rather, the Court permitted the proponents of the Plan to present argument concerning the contents of the newly-filed Second Amended Joint Plan of Reorganization and accompanying Disclosure Statement. A portion of the hearing was devoted specifically to the modifications made by the proponents in response to the objections filed by creditors, the Committee of Equity Security Holders, and the United States Trustee. The Court scheduled for March 17, 1986 a further hearing on such objections to the Disclosure Statement as might remain after consideration of the proponents' modifications.

Because a hearing on confirmation of the Joint Plan previously had been set for April 16, continuation of the Disclosure Statement hearing reduced the time period available for dissemination of, voting upon, and objecting to the Joint Plan. Consequently, the Court *sua sponte* shortened the twenty-five-day notice period mandated by Bankruptcy Rule 2002(b), and designated April 10, 1986 the bar date for objections to the Joint Plan. Pursuant to Bankruptcy Rule 3017, the Court designated April 9, 1986 the bar date for votes on the Joint Plan.

At the April 17, 1986 continuation of the hearing on confirmation of the Joint Plan, the Court heard the proponents' motion, filed April 15, 1986, to extend the time for submission of ballots, and to permit creditor Yorkwood Savings & Loan Association, which had submitted a revised ballot, to change its vote. Also before the Court was the motion of American Savings & Loan Association of Irvine, California for permission to change its vote. Revealed in the ensuing argument was the additional fact that an undetermined number of limited partners may have already changed their votes by submitting a superseding

ballot which had accompanied a letter of solicitation mailed by counsel for the debtors-in-possession. Such superseding ballots also could be among those ballots received out of time. The proponents made an oral request for approval of the proponents' inclusion of all timely superseding ballots in the final tally of votes.

The Class Action Plaintiffs objected to the proponents' motion to extend the time for submission of ballots. The objection, however, concerned only those tardy votes that were also superseding ballots submitted by limited partners. This objection will be considered in the discussion of the proponents' request for permission to include changes of vote and superseding ballots in the final tabulation. No other party objected to the motion to extend time.

This Court has ample authority to modify its own orders. *See Pfister v. Northern Illinois Finance Corp.*, 317 U.S. 144, 153, 63 S.Ct. 133, 139, 87 L.Ed. 146 (1942) (bankruptcy court may, in its discretion, extend time for filing a petition for review); *Commercial Credit Corp. v. Skutt*, 341 F.2d 177, 181 (8th Cir.1965) (bankruptcy court may modify its own order so long as such modification does not prejudice intervening rights); *In re Parr*, 1 B.R. 453, 455 n. 2 (Bankr.E.D.N.Y.1979) ("In its equitable powers, the Bankruptcy Court may vacate or modify previous orders when subsequent events demonstrate the necessity therefor. *In re Texlon Corp.*, 596 F.2d 1092, 1100–01 (2d.Cir.1979)."); *See also In re Featherworks Corp.*, 36 B.R. 460, 462 (E.D.N.Y.1984) (affirming bankruptcy court's extension of voting period because no prejudice shown by appellant). The proposed extension of time would permit the proponents to include in the tally some twenty-five percent of the total number of ballots cast. The proponents represented

April 30, and itself expired on that date. At least one mortgage insurer indicated that it would not extend the escrow agreement beyond April 30. Also, the future of Ticor Mortgage Insurance Company was precarious in view of its potential exposure on claims against its EPIC policies. (The California Commissioner of Insurance later applied for and received an order

of conservatorship under which the California Department of Insurance controlled and eventually rehabilitated the company.) Thus, even if the FHLBB were willing to accept additional escrowed funds to bring the affected EPIC loans current beyond October 30 (thus extending the period for confirmation beyond April 30), the availability of additional funds was uncertain.

that the majority of these out-of-time votes were dated as cast within the balloting period but were received after its expiration.

It must be noted that the voting period was unusually brief for a case of this complexity. Several factors persuaded the Court to permit such an abbreviated schedule for consideration of the Second Amended Joint Plan; not the least of these factors was the necessity for a decision on confirmation before April 30, 1986 and the desirability of continuing the hearing on approval of the Disclosure Statement. Also, the proponents needed sufficient time to tally the votes and determine acceptance or rejection of the Joint Plan in each of seven classes in three hundred and fifty-two debtor partnerships. The April 9, 1986 voting deadline gave the proponents six days to complete this task before the April 16, 1986 hearing on approval of the Joint Plan. The proponents were able to tender to the Court an accounting of all votes received through 6:00 o'clock, p.m. on April 15, 1986.

The Court found that no prejudice would result from granting the proponents' motion. In fact, the extension of time made possible by the proponents' diligence in tabulating the votes mitigated the undesirable effects of the expedited schedule for consideration of this Joint Plan. Consequently, the Court extended the balloting period to 6:00 o'clock, p.m. on April 15, 1986.

The Class Action Plaintiffs objected to the proponents' motion for permission to count changed votes to the extent such changed votes were superseding ballots submitted by limited partners. There were no objections to the proposed changes of vote by creditors Yorkwood Savings & Loan Association and American Savings & Loan Association of Irvine, California.

The ground of the Class Action Plaintiffs' objection was the procedural mandate contained in Bankruptcy Rule 3018(a):

> For cause shown and within the time fixed for acceptance or rejection of a plan, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection.

Bankruptcy Rule 3018(a). The Class Action Plaintiffs noted that the rule demands a showing of cause in order that a vote be changed, and asserted that the proponents had shown no valid cause for a change of vote by limited partners. The sole cause for a vote change, urged the Class Action Plaintiffs, was the mischaracterization of the Joint Plan contained in a letter of solicitation to which a superseding ballot was attached. The letter was circulated to all limited partners of the debtor partnerships by counsel for the debtors-in-possession. The Class Action Plaintiffs further argued that the motion to permit changes of vote was not timely because the voting period had expired, and that the proponents had not given proper notice of the changes of vote by submission of a superseding ballot made by limited partners during the voting period.

■ As an initial matter, the Court found that all parties received notice adequate in the circumstances. Although the proponents made no formal motion regarding the superseding votes submitted by limited partners, the Committee of Equity Security Holders raised the issue in its Supplement to Amended Motion of Equity Security Holder's [sic] Committee to Invalidate Voting on Debtors' Second Amended Joint Plan of Reorganization[3], which was filed and served on the entire service list on April 11, 1986. The motion, which was augmented by the supplement, was in the nature of an objection to confirmation of

---

**3.** Pursuant to the Settlement Agreement entered into by the proponents and the Committee of Equity Security Holders and approved by the Court April 17, 1986, the Committee, in exchange for modifications to the Joint Plan, withdrew its objections to the Joint Plan, to the Disclosure Statement and to the voting and so-

licitation process. The Committee also dismissed with prejudice both its adversary proceeding in this Court and its appeal of this Court's approval of the Disclosure Statement then pending before the United States District Court for the Eastern District of Virginia.

the Joint Plan, and therefore was set for hearing on April 16, 1986.

Further, the hearing on confirmation of a plan necessarily encompasses all issues regarding voting upon the plan. Therefore, while the circumstances before the Court represented less than a model of the appropriate procedure, the Court could not find that any party was hindered, surprised or prejudiced by consideration of the oral motion of the proponents that the Court approve tallying of superseding ballots.

■ Under the unambiguous terms of the rule, a motion is timely heard only during "the time fixed for acceptance or rejection of a plan." Bankruptcy Rule 3018(a). In juxtaposition with the language of the rule is the Court's equitable discretion to consider late-filed motions. *See Wayne United Gas Co. v. Owens-Illinois Glass Co.*, 300 U.S. 131, 137, 57 S.Ct. 382, 386, 81 L.Ed. 557 (1937) (a district court sitting in bankruptcy may consider a late-filed motion for rehearing if no prejudice to intervening rights will result).

Rendering the only opinion resolving a similar conflict, the United States Bankruptcy Court for the Northern District of Illinois denied a tardy application for leave to amend ballots. *In re Jartran*, 44 B.R. 331 (Bankr.N.D.Ill.1984). The court stated:

> The Court is reluctant to rule that the exercise of judicial discretion concerning a tardy change or withdrawal of vote is completely precluded by the language of Rule 3018. There may be exceptional circumstances which, in light of the spirit of Chapter 11 to promote consensual plans, would warrant such a change notwithstanding the unequivocal language of the Rule. However, in this case no such exceptional circumstances exist.

44 B.R. at 363. The *Jartran* court further supported its denial of leave to change votes with a declaration that the change,

because made pursuant to a Litigation Settlement Agreement which compromised an adversary proceeding, was against public policy. *Id.*

If this Court were to accept the *Jartran* ruling, the matter *sub judice* nevertheless presents the exceptional case reserved by the *Jartran* court. The FHLBB April 30 confirmation deadline necessitated an abbreviation of the voting period typical for a case of this complexity. Pursuant to this Court's March 18, 1986 Order Approving Disclosure Statement, the debtors-in-possession had five days within which to mail the Plan and Disclosure Statement to holders of a claim or interest. Assuming the materials were promptly received, voters had ten to fourteen days to examine the two documents, determine the direction of their vote, and return the ballot. It is not surprising that a significant number of limited partners seized the opportunity, provided by counsel for the debtors-in-possession, to reconsider their votes.[4] The letter of solicitation urged an affirmative vote on the Plan and assured limited partners that "[t]he ballot bearing the later date will supersede your previous vote and be counted."

Clearly, responsibility for the changes of vote without prior approval lies with the debtors' counsel. However, the brevity of the voting period, and the intricacy of the Second Amended Joint Plan of Reorganization and its supplements, made voters particularly likely to reevaluate their votes. The Court found that, in these circumstances, failure to obtain court approval prior to the expiration of the voting period should not bar consideration of the present application to count superseding ballots.

■ The same factors provided cause, required by Bankruptcy Rule 3018, for the changes of vote by creditors and limited partners. The Class Action Plaintiffs as-

---

4. Three hundred and thirty-three votes were changed, of which three hundred and thirty-one were votes of limited partners changed by submission of a superseding ballot. Two hundred and sixty-five limited partners amended their rejecting ballots to accepting ones; fifty recant-

ed their acceptance in favor of rejection. Sixteen limited partners changed their rejection to acceptance, only to reject the Joint Plan again. *See* Report on Changed Votes for Debtors' Second Amended Joint Plan of Reorganization.

serted that the sole cause for changes of vote by limited partners was the allegedly misleading nature of the debtors' letter of solicitation. A ruling on the propriety of the letter of solicitation was unnecessary because there resulted no prejudice to the Class Action Plaintiffs from inclusion of the superseding ballots in the final tally. *Cf. In re Featherworks Corp.*, 36 B.R. 460, 462 (E.D.N.Y.1984) (affirming bankruptcy court's extension of voting period because no prejudice shown by appellant).

Under the tally of timely votes, including superseding ballots, Class Five, the class of limited partners, accepted the Joint Plan in only eighty-five of the debtor partnerships. Inclusion of the late-filed votes, including superseding ballots, reduced that number to eighty-three. In a subsequent report, the proponents noted that the majority of superseding ballots were cast and received within the balloting period. The number of accepting Classes Five if all superseding ballots were excluded thus is undetermined. However, because the Plan was already in a cram-down posture as to the majority of the Classes Five, a further reduction in the number of accepting Classes Five was without consequence.

The only cognizable prejudice to the Class Action Plaintiffs was a possible decrease in the number of participants in the class action. Article XX(B) of the Second Amended Joint Plan of Reorganization provides:

> On the Effective Date, each holder of a First Mortgage Note, (including, in the case of a Loan Pool, the Trustee of such Loan Pool for its interest as Trustee and the interests of the beneficiaries of the Pool), a Second Mortgage Note, or a certificate of interest in a Loan Pool, and each limited partner of a Debtor shall be deemed to have assigned to MDIF all of its Claims against MDIF, Community, the subsidiaries of Community, Epicenter Consolidated, Ltd., EPIC Holding, Ltd., and its affiliates, the Nonbankrupt Partnerships and their properties and their past and present officers, directors, shareholders and employees, provided

that such assignment shall not include (i) Claims of holders of First Mortgage Notes or Second Mortgage Notes arising under such notes or the Properties securing such mortgages and the proceeds thereof; (ii) the Claims of limited partners of any Debtor to property of such Debtor; or (iii) Claims arising under the Joint Plan. Such assignment of claims shall specifically include, but not be limited to: (x) Claims asserted in *National Bank of Washington, et al. v. EPIC Mortgage Inc., et al.* and any similar claim asserting wrongful or negligent acts by the aforementioned entities or individuals with regard to such Mortgage Notes, the holders thereof, or any person suing through them or on their behalf; and (y) claims asserted in any suits by limited partners of any Debtor, whether pending or potential, against the aforementioned entities or individuals[.]

Debtors' Second Amended Joint Plan of Reorganization, Article XX(B): Assignment of Claims, at 39 [hereinafter "Joint Plan"].

Obviously, the causes of action asserted in the class action suits are assigned to the Maryland Deposit Insurance Fund ("MDIF") if Article XX(B) creates a binding assignment, because the suits plainly assert causes of action against parties named in the text of the provision. For the purpose of this objection, however, the Class Action Plaintiffs were primarily concerned with the secondary, "contractual" assignment of claims found in Article XXII(K):

> By voting in favor of the Joint Plan, each holder of a claim or interest acknowledges that the assignment of claims provision as set forth in Article XX and in the Disclosure Statement applies to such holder and agrees to make such an assignment of its claims upon Confirmation of the Joint Plan in order to participate in the sharing of such proceeds as set forth in the Joint Plan.

Joint Plan, Article XXII(K), at 43.

The Court could not accept as dispositive the Class Action Plaintiffs' argument that under Article XXII(K) each affirmative

vote by a limited partner decreased the size of the class potentially represented in the pending Maryland litigation. The United States District Court for the District of Maryland had not certified a class of plaintiffs. The Class Action Plaintiffs had no assurance that a class could be certified. The injury complained of, therefore, was entirely speculative. Further, this Court's ruling on the objections to the assignment provisions leaves the Class Action Plaintiffs free to contest the validity of the assignments themselves before the United States District Court for the District of Maryland. *See* discussion *infra.*

The mere conjecture that these superseding ballots would prejudice the class action litigation was insufficient to overcome Congress' commitment to a consensual plan of reorganization embodied in Chapter 11 of the Bankruptcy Code. Consequently, the Court permitted the proponents to include all superseding ballots in the tally of votes on the Plan. The Court also granted Yorkwood Savings & Loan Association and American Savings & Loan Association of Irvine, California permission to amend their votes.

ASSIGNMENT OF CLAIMS PROVISIONS

Several parties objected to confirmation based upon the assignment provisions contained in the Joint Plan. *See* Joint Plan, Articles XX(B), at 39 and XXII(K), at 43 (excerpted *supra* ). First National Bank of Maryland ("FNB"), an institution acting as trustee for institutions investing in EPIC mortgage-backed securities (collectively, "Certificateholders"), and South Boston Savings Bank ("SBSB"), one of FNB's constituents, objected to the assignment based upon the impact of the provisions upon litigation pending in the United States District Court for the Eastern District of Virginia.

Presently coordinated by the Judicial Panel on Multidistrict Litigation for pre-trial proceedings in the Eastern District of Virginia are six federal and one state action to rescind policies of insurance issued on EPIC mortgages. The four plaintiff mortgage insurers, which are not participants in the Joint Plan[5], allege fraud or misrepresentation in the policy application process by EPIC Mortgage, Inc. ("EMI"), its agents, officers, and affiliates. Although EMI is a named defendant, the Certificateholders for which FNB acts as trustee are the present beneficiaries of the insurance policies. Hence, FNB and certain of its constituents also are named defendants.

Because EMI, the party accused of fraud, no longer has an interest in the mortgages insured by the plaintiffs, it will bear no immediate financial hardship should there be a finding of fraud and a rescission of the mortgage insurance. Accordingly, EMI can only be subject to adverse consequences upon FNB's and the Certificateholders' exercise of their contingent rights to recoup their losses, which are due to EMI's misconduct, from EMI, its insiders and affiliates. Such claims, however, are squarely within the purview of the assignment provisions, Articles XX(B) and XXII(K)[6], and consequently are assigned to MDIF upon confirmation of the Joint Plan.

FNB and SBSB put forward several reasons why these contingent claims against EMI are sufficiently distinguishable from all other claims against the named entities as to be excepted from the assignment. First, FNB argued that the controversy in the rescission litigation is entirely outside

5. The plaintiffs in the rescission litigation are Commonwealth Mortgage Assurance Company, Foremost Guaranty Corporation, U.S. Mortgage Insurance Company, and United Guaranty Residential Insurance Company of Iowa. Three non-plaintiff mortgage insurers, however, are indispensible participants in the Joint Plan. *See e.g.,* footnote 2 *supra* (discussion of escrow fund created by participating mortgage insurers). These insurers are TMIC Insurance Company, Inc. (formerly Ticor Mortgage Insurance Company), Republic Mortgage Insurance Company, and Wisconsin Mortgage Assurance Corporation (formerly Mortgage Guaranty Insurance Corporation).

6. FNB's constituent certificateholders voted unanimously in favor of the Joint Plan.

the Chapter 11 proceedings, because it does not concern any aspect of the debtors' estates. The plaintiff mortgage insurers are non-participants in the Joint Plan, and the Certificateholders' contingent claims are against a non-debtor.

FNB further asserted that unforeseen prejudice to its defense of the rescission actions was an unavoidable result of the assignment. In FNB's evaluation the assignment removed as incentive for EMI's conscientious defense of the rescission actions the certainty of future contingent liability to the Certificateholders. FNB alleged that assignee MDIF had interests adverse to, rather than representative of, the interests of Certificateholders. It is in the Certificateholders' interest to disprove fraud in the recission litigation; conversely, MDIF is presently pursuing against EPIC insiders, who are also insiders of EMI, a lawsuit which alleges extensive misconduct. Also, because MDIF, in its capacity as conservator of Community Savings and Loan, Inc., controls EMI, FNB had named MDIF as a defendant in several cross-claims asserted in the rescission litigation. The assignment thus placed control of the contingent claims of the Certificateholders with an adverse party, MDIF's assurances of cooperation notwithstanding.

SBSB stressed a different consequence of the claims assignment. If the mortgage insurers' fraud action were unsuccessful, the insurers might assert, upon presentation of an insurance claim, a defense to payment based upon the assignment of claims contained in the Joint Plan. The insurers might argue that because the assignment prejudiced the insurers' subrogation rights, the insured parties violated the insurance contract, thereby releasing the insurers from liability on the policies. Several of the policies at issue expressly reserve the subrogation rights of the insurers. In some cases, the policy requires that the insured party refrain from any action which would prejudice the carrier's subrogation rights.

In addition to these contractual rights, argued SBSB, the common law affords an insurer subrogation to the rights of an insured party against those who cause or contribute to insured losses. The insurers, therefore, would escape liability on the mortgage insurance policies if a subsequent court were to find that the assignment by the insured parties impaired the insurer's ability to assert as subrogee its policyholders' claims against EMI.

The objectors' final argument portrayed the inclusion of these contingent claims in the assignment as unintended and inequitable. Countering the proponents' argument that the assignment is a surrender of rights in return for assignee MDIF's substantial contribution to the Joint Plan, the objectors pointed to their failure to benefit from critical Joint Plan provisions. For example, because the interests of Certificateholders are secured by mortgages insured by non-participating mortgage insurers, the Certificateholders do not benefit from the modification of interest rates contained in the Joint Plan. Similarly, the Certificateholders derive no benefit from the escrow fund established by participating insurers to cover interest defaults through October 30, 1985. *Compare* Joint Plan, Article IV(C), at 8 (treatment accorded Class 2A Allowed Claims) *with id.* Article IV(D), at 9 (treatment accorded Class 2B Allowed Claims). Consequently, the defendant Certificateholders' loans have been "scheduled" as delinquent loans pursuant to the usual regulations of the FHLBB. *See generally* footnote 2 *supra* (discussion of FHLBB regulations).

Rather than a classic *quid pro quo*, then, the objectors found the assignment of these contingent claims to be an unanticipated destruction of the objectors' ability to defend the rescission litigation. In these circumstances, the assignment dispensed with the traditional legal remedy which enables a nominal defendant to pass the ultimate loss on to culpable parties. FNB and SBSB requested that the Court exclude from the assignment of claims to MDIF their contingent rights of action in the rescission litigation.

Other objecting parties took a broader tack. The Class Action Plaintiffs disputed the claims assignment on the grounds that the assignment *in toto* seized valuable rights in violation of substantive due process of law and was beyond the jurisdiction and authority of this Court. The Class Action Plaintiffs' objection was grounded upon the prospect of distribution of sale proceeds under the Joint Plan.

The Class Action Plaintiffs believed that their chance of receiving a distribution under the Plan was highly remote, primarily because the Plan was crafted to provide the maximum return for first mortgage holders while limiting the exposure of the participating insurers. These objectors believed the sole practical benefit to limited partners contained in the Joint Plan to be avoidance of substantial and immediate tax losses, accomplished by the delayed disposition of each partnership's properties. The Class Action Plaintiffs admitted that the Bankruptcy Code itself places equity security holders in a subordinate position. They protested, however, the portion of the Joint Plan which required that limited partners make a capital contribution to the workout in the form of an assignment to MDIF of their potential claims.

Under the objectors' analysis, the distribution of proceeds obtained by MDIF in prosecution or settlement of the assigned claims is inequitable, and forces the limited partners to fund the Joint Plan against their will. For each dollar of the claims assigned to MDIF, opined the objectors, less than a dollar would be received pursuant to the distribution scheme contained in the Joint Plan. *See* Joint Plan, Article XX(C): Sharing of Proceeds from Prosecution of Certain Claims, at 40–41. Because the limited partners would not receive adequate compensation for their property, the objectors urged, the assignment violates the Due Process Clause of the Fifth Amendment to the Constitution. The Class Action Plaintiffs further found the assignment and scheme of distribution so inequitable as to call into question the good faith of the proponents. *See* 11 U.S.C. § 1129(a)(3) (plan of reorganization must be proposed in good faith).

Furthermore, the objectors asserted that this Court was without authority to approve the assignment. Under the assignment provisions of the Joint Plan, the parties must entrust sole control of the assertion, prosecution, dismissal and settlement of their claims against debtors and certain non-debtors to MDIF. *See* Joint Plan, Article XX(C)(3), at 41. The Class Action Plaintiffs argued that MDIF, through the manner of its prosecution of the assigned claims, would have the power to "reorganize" or "discharge" numerous non-debtor/defendants. To illustrate, MDIF would receive by the assignment absolute control of all claims against itself. Clearly, MDIF would hold the unchecked power to escape all potential liability to the Class Action Plaintiffs.

Citing *In re Diversey Building Corp.*, 86 F.2d 456, 457 (7th Cir.), *cert. denied*, 300 U.S. 662, 57 S.Ct. 492, 81 L.Ed. 870 (1937) and *In re A.J. Mackay*, 50 B.R. 756, 761 (D.C.Utah 1985), the objectors noted that the limited jurisdiction of a Bankruptcy Court does not permit the discharge of non-debtors. Because the Court cannot discharge non-debtors, reasoned the Class Action Plaintiffs, it cannot permit MDIF to do so.

The foundation upon which the objectors constructed this argument was, of course, their contention that the assignment provisions are tantamount to a discharge of the assigned claims. The proponents hotly contested this characterization, both in their brief in support of confirmation and in oral argument.

The Class Action Plaintiffs specifically challenged the contractual assignment contained in Article XXII(K), under which an affirmative vote on the Joint Plan operates as an assignment of claims and entitles the voter to a share of the recovery, on a related ground. Under the authority of *Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982) ("A creditor's approval of the plan cannot be deemed an act of assent having significance beyond

the confines of the bankruptcy proceedings[.]"), the objectors argued that the Article XXII(K) assignment was impermissible. The *Union Carbide* court invalidated under Section 16 of the Bankruptcy Act of 1898 a plan provision which deemed acceptance of the plan to effect a "full settlement, satisfaction and discharge of all claims, demands, actions, causes of action or otherwise against not only the Debtor but also against other persons or entities who have entered into guaranty or indemnity agreements with unsecured creditors or who have endorsed commercial paper for the benefit of the Debtor." 686 F.2d at 594.

The proponents distinguished the contractual claims assignment from the "full settlement, satisfaction and discharge" at issue in *Union Carbide*. Under the Article XXII(K) assignment, affirmative voters would share in the recovery obtained by MDIF's prosecution or settlement of the assigned claims. Thus, the situation of limited partners who assign their claims, according to the proponents, was not analogous to that of assenting creditor Union Carbide, which by operation of the reorganization plan lost completely its rights against third-party guarantors.

The Class Action Plaintiffs' final attack on the assignment provisions rested upon the procedural guarantees found in the Due Process Clause of the Fifth Amendment to the Constitution. The Class Action Plaintiffs compared MDIF's prosecution of the assigned claims to representation of all similarly situated class members by the named plaintiff in a class action. Each proceeding, noted the objectors, is characterized by its binding effect on non-participating parties. On the strength of this analogy, the objectors argued that the Constitution compelled this Court to apply the safeguards attendant to the class action form to this sweeping assignment of claims. *See Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Because the Joint Plan imposes no restriction on MDIF's handling of the assigned claims, the objectors argued, the provisions are unconstitutional. *See* Joint Plan, Article XX(C)(3), at 41. ("The assertion, prosecution, collection, settlement, dismissal, and compromise of any and all [assigned] claims shall be solely in the control of MDIF, and MDIF shall have absolute discretion to settle, dismiss, or compromise any and all such claims without any other obligation to any other entity save for the obligation to share proceeds[.]").

In particular, the Class Action Plaintiffs maintained that MDIF was not a proper representative to pursue limited partners' claims because MDIF and Community Savings and Loan, Inc., of which MDIF is conservator, are defendants in the class action litigation. Not only were certain of MDIF's interests adverse to those of the Class Action Plaintiffs, MDIF's and the limited partners' differing treatment under the Joint Plan dictated divergent strategies for prosecution of claims against other entities, rendering MDIF an entirely unsuitable representative party. The Class Action Plaintiffs further argued that the mandatory participation by limited partners in a suit prosecuted by MDIF, contemplated by the Joint Plan, would violate the limited partners' right to control litigation in which they continued to hold a financial stake.

■ The Court found that the proper course was to confirm the Joint Plan without determining the validity of the assignment provisions, for the jurisprudential tradition that courts decide only those matters ripe for adjudication prevented a ruling on the objections presented. Neither FNB, its constituent SBSB nor the Class Action Plaintiffs had presented the Court with a controversy regarding the claims assignment ripe for consideration.

FNB and SBSB were involved in insurance rescission litigation upon which, they alleged, the claims assignment would have a marked and anomolous impact. While all contemplated effects of a plan of reorganization are prospective, those effects of the assignment cited by these objectors were contingent upon the occurrence of a multitude of events. Consequently, the parties placed before the Court no verified facts

regarding the impact of the claims assignment. In truth, should the contemplated series of events fail to occur, the assignment would never become an issue.

For example, FNB asserted in its objection that its preliminary defense to the rescission action was that "any alleged fraud or misrepresentation by EMI, which is disputed, cannot be asserted against third-party purchasers-for-value, such as FNB and its Certificateholders, who are the assignees of the insurance policies." Should this defense prove successful, the assignment provisions will have no impact on the suits initiated by the nonparticipating mortgage insurers. Similarly, if the insurers fail to carry their burden to prove fraud on the part of EMI and its principals, the assignment provisions will not come into play.

Likewise, SBSB informed the Court of its contemplated attack should a mortgage insurer refuse to pay claims on the ground that the assignments prejudiced the insurers' subrogation rights. Specifically, SBSB planned to argue that "[t]he actions of the insurers in seeking to rescind their coverage should be viewed as an anticipatory repudiation, relieving the insureds of further obligations to comply with the terms of their policies." Thus, the anticipated impact of the assignment was contingent upon the mortgage insurers' failure to establish fraud in the rescision actions, an insured party's claim under an EPIC policy, an insurers' decision to defend against the claim with the assertion that the assignment interfered with the insurer's subrogation rights, the failure of SBSB's anticipatory repudiation argument, and the insurer's success in showing prejudice to its subrogation rights.

■ This Court, and other federal courts, have jurisdiction to rule upon controversies arising under a plan of reorganization. However, the Court is not called upon to rule on entirely speculative disputes and thereby strike, edit, restrict or clarify a plan provision before adequate facts genuinely present the issue. *Cf. Roe v. Wade*, 410 U.S. 113, 128–29, 93 S.Ct.

705, 714, 35 L.Ed.2d 147 (1973) (affirming district court's dismissal on ripeness grounds of a claim which was based upon the uncertain occurrence of several future events). Such prospective rulings would do nothing to advance the cause of judicial economy, and pose a genuine danger that pertinent facts will escape the Court's consideration. Plainly, it was at this juncture impossible to determine the effect of the assignments on the rescission litigation in a manner sufficient to enable this Court to make a well-reasoned ruling. It was equally evident that a ruling on the validity of the assignment of these contingent claims may never be necessary.

The objectors may remain assured that, when a ripe controversy exists, this or another Court will entertain a proper challenge to a plan provision. The opinion of the United States Court of Appeals for the Seventh Circuit in *Union Carbide v. Newboles*, 686 F.2d 593 (7th Cir.1982) makes clear that a court of competent jurisdiction will strike an impermissible plan provision when a justiciable controversy exists.

The posture of the parties in *Union Carbide* contrasts sharply with the situation of the objectors before this Court. After it cast an affirmative vote on debtor New-Kro Oil Company's plan of reorganization, and the bankruptcy court confirmed the plan, creditor Union Carbide brought an action for the deficiency on a New-Kro promissory note against Newboles, as guarantor. 686 F.2d at 594. Newboles raised as an affirmative defense a plan provision which deemed acceptance and confirmation of the plan a satisfaction and discharge of all claims against those who guaranteed New-Kro debts. *Id.* at 595 (text of release provision quoted *supra*). The Seventh Circuit found the provision invalid. *Id.* Until objectors FNB and SBSB attain the procedural footing presented to the *Union Carbide* court, no judicially cognizable injury exists of which they might complain.

■ FNB and SBSB grounded their objections in the unique impact of the assignment on particular pending litigation. In

contrast, the Class Action Plaintiffs raised broad Constitutional questions regarding the overall validity of the assignment. For the purpose at hand, however, this distinction lacks a difference.

Presumably, the Class Action Plaintiffs have a motion for certification of a class of plaintiffs pending before the United States District Court for the District of Maryland. To the extent that the Class Action Plaintiffs anticipated that the defendants in the Maryland litigation may raise the claims assignment in an objection to certification, or in support of a motion to dismiss the actions, the Constitutional issues would be properly before the district court. That court had before it all parties at interest in the class action who might wish to be heard on the matter, while this Court did not. Furthermore, the district court will have a fully-developed factual situation from which to evaluate the assignment, an advantage not enjoyed by this Court. This practical advantage cannot be gainsaid, for familiarity with the class action claims undoubtedly need inform any court's evaluation of the objectors' Fifth Amendment arguments. Consequently, this Court deferred to the competent jurisdiction and ability of the district court to consider all facets of the issues raised.[7]

*Underhill v. Royal,* 769 F.2d 1426 (9th Cir.1985), recently decided by the United States Court of Appeals for the Ninth Circuit, related a circumstance similar to the instant case and provided authority for this Court's abstention. After National Mortgage Exchange of Southern California ("NMESC") filed for reorganization under Chapter 11 of the Bankruptcy Code, investor Underhill (an unsecured creditor who held an investment interest in promissory notes executed by NMESC) filed a class action alleging securities fraud on the part of Royal, the principal shareholder of NMESC.

The proposed plan of reorganization provided that NMESC would exchange the promissory notes in which Underhill and the prospective class members held an interest for property held by a financial institution. NMESC was to use the property obtained in the exchange to secure a loan intended to satisfy creditors' claims. Attached to the proposed exchange transaction was a release by investors in the promissory notes of all claims against NMESC, its affiliates and insiders. 769 F.2d 1429–30.

Eighty-nine percent of the creditors approved the plan; Underhill, however, raised objections to the release provision. The bankruptcy court confirmed the plan, explicitly leaving to the district court hearing the class action a ruling on the scope and enforceability of the release provision. *Id.* at 1430. The Ninth Circuit rendered its opinion on appeal of, among other matters, the district court's ruling that the claims release was unenforceable.

As were those in *Underhill,* the issues raised by these Class Action Plaintiffs were certain to be taken up by a court of competent jurisdiction, in all probability by the court before which the class action suits stood pending. The Joint Plan explicitly acknowledged the jurisdiction of courts other than this Bankruptcy Court to pass upon the validity of the assignment provisions. *See* Joint Plan, Article XX(C)(2)(d)(ii), at 40. In these circumstances, consideration of the matter in the bankruptcy forum would have been an ill-conceived division of judicial labor, entailing the substantial risk of passing upon the matter without benefit of a fully-developed evidentiary record.

Accordingly, the Court declined to rule upon the scope or validity of the assignment of claims contained in Articles XX(B) and XXII(K), thus avoiding any *res judicata* effect that may have been interpreted from the Court's confirmation of the Joint

---

**7.** Of course, this is not to imply that the United States District Court for the District of Maryland alone would be competent to consider the arguments raised by the Class Action Plaintiffs. Rather, it appeared likely that that court would be the first court properly presented with the issues. It is plain that any court of competent jurisdiction may resolve these Fifth Amendment claims when the disputes become ripe for adjudication.

Plan. The objecting parties remain free, upon the maturity of their disputes, to litigate the propriety of the assignment provisions. This course ensures that disputes under the Joint Plan will neither be decided in advance of a cognizable claim, nor permitted to evade comprehensive review.

For the reasons set forth herein as well as those contained in the record of the hearings on these matters, this Court entered an order approving the Disclosure Statement on March 18, 1986, and an order confirming the Joint Plan on April 25, 1986.